[ORAL ARGUMENT TO BE HELD ON OCTOBER 8, 2009]

No. 09-5236

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

DJAMEL AMEZIANE,
Petitioner-Appellee,

v.

BARACK OBAMA, et al.,
Respondents-Appellants.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
_____

OPENING BRIEF FOR APPELLANTS
_____

TONY WEST
 *Assistant Attorney General*

DOUGLAS N. LETTER
 (202) 514-3602
ROBERT M. LOEB
 (202) 514-4332
AUGUST E. FLENTJE
 (202) 514-1278
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7242*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., N.W.*
 *Washington, D.C. 20530-0001*

_____
_____

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROVISIONS AT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      THE DISTRICT COURT'S ORDER IS SUBJECT TO
        IMMEDIATE REVIEW AS A COLLATERAL ORDER, OR, IN
        THE ALTERNATIVE, THROUGH A WRIT OF MANDAMUS . . . . . . . 15

II.     THE DISTRICT COURT ERRED IN DECLINING TO SEAL THE
        REVIEW PANEL TRANSFER DECISION . . . . . . . . . . . . . . . . . . . . . . . 23

        A.      The Government Has A Significant National Security and
                Foreign Policy Interest in Closing Guantanamo And
                Promptly Resettling or Repatriating Detainees . . . . . . . . . . . . . . . . 23

**PROTECTED INFORMATION – FILED UNDER SEAL**

B.     Ambassador Fried Established That Releasing the Review
       Panel Decision Would Damage The Significant National
       Security and Foreign Policy Interests in Closing Guantanamo
       and Repatriating or Resettling Detainees . . . . . . . . . . . . . . . . . . . . . 25

C.     The District Court Erred by Failing To Accord Substantial
       Deference to Ambassador Fried's Assessment That Release
       Would Harm Significant Interests . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.     There Is No Common Law or Other Right of Public Access
       to the Review Panel Decision Information Contained in Court
       Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.     Public Release Of The Information Would Provide No Public
       Benefit Or Benefit to Petitioner . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

F.     The District Court's Other Rationales For Releasing the
       Information Are Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF COMPLIANCE WITH
       RULE 32(a)(7)(C) OF THE FEDERAL RULES
       OF APPELLATE PROCEDURE

CERTIFICATE OF SERVICE

ADDENDUM

**TABLE OF AUTHORITIES**

<u>Cases</u>:

*Al Ginco v. Obama*, No. 05-1310, Order
    (D.D.C. July 26, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 39

*Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . 16

*Belize Telecom, Ltd. v. Government of Belize*, 528 F.3d 1298
    (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Center for National Security Standards v. U.S. Department of Justice,*
    331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Chicago & S. Air Lines v. Waterman*, 333 U.S. 103 (1948) . . . . . . . . . . . . . 15, 34

*Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949) . . . . . . . . 15, 16, 18

*In re Copley Press, Inc.*, 518 F.3d 1022 (9th Cir. 2008) . . . . . . . . . . . . . 16, 18, 20

*Cottone v. Reno*, 193 F.3d 550 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 46

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 27

*Digital Equip. Corp. v. Desktop Direct, Inc.,*
    511 U.S. 863 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Executive Office of the President*, 215 F.3d 20
    (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Falesteny v. Obama*, No. 05-2386, Order, dkt. 1362
    (D.D.C. July 23, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 45

**PROTECTED INFORMATION – FILED UNDER SEAL**

*\*Fitzgibbon v. C.I.A.*, 911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . 15, 32, 34, 46

*Flynt v. Rumsfeld*, 355 F.3d 697 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 36

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Haig v. Agee*, 453 U.S. at 293-94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Holmes v. Laird*, 459 F.2d 1211 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . 35

*Joo v. Japan*, 413 F.3d 45 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Kerr v. United States District Court*, 426 U.S. 394 (1976) . . . . . . . . . . . . . . . . . 21

*Kiyemba v. Obama*, 561 F.3d 509 (D.C. Cir. 2009) . . . . . . . . . . . . . 10, 14, 29, 42

*\*Mattan v. Obama*, No. 09-745, Mem. & Order
    (D.D.C. July 2, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Munaf v. Geren*, 128 S. Ct. 2207 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 42

*Nat'l Ass'n of Criminal Def. Lawyers, Inc. v. United States
    Dep't of Justice*, 182 F.3d 981 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . 21, 22

*Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978) . . . . . . . . . . . . . . 33

*North Jersey Media Group v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002) . . . . . . . . 37

*In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . 20, 21

*Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 30

*Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) . . . . . . . . . . 36, 38, 39

*Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979) . . . . . . . . . . . 17, 20

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
    506 U.S. 139 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Reporters Committee*, 773 F.2d 1325 (D.C. Cir. 1985) . . . . . . . . . . . . . . 37

*Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354 (1959) . . . . . . . . . . . . . 35

*SafeCard Servs. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . 30

*In re Sealed Case*, 151 F.3d 1059 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 22

*In re Sealed Case (Medical Records)*, 381 F.3d 1205
    (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 20

*Titanium Metals Corp. v. N.L.R.B.*, 392 F.3d 439
    (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,-35, 41

*United States v. El-Sayegh*, 131 F.3d 158
    (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 32, 38, 43

*United States v. Gonzales*, 150 F.3d 1246 (10th Cir. 1998) . . . . . . . . . . . . . . . 40

*United States v. Hubbard*, 650 F.2d 293 (1980) . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Nixon*, 418 U.S. 683 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Yunis*, 867 F.2d 617 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . 34

*United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006) . . . . . . . . . . . . . . . 15, 34

*Watson v. Lowcountry Red Cross*, 974 F.2d 482
(4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 33

*Yoyej v. Obama*, No. 05-2386 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Statutes**:
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16
28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Executives Orders**:
Exec. Order 13,492,
74 Fed. Reg. 4897 (Jan. 22, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26
Exec. Order 13,492, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 39
Exec. Order 13,492, § 2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Exec. Order 13,492, § 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Exec. Order 13,492, § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Exec. Order 13,492, § 4(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Exec. Order 13,492, § 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Exec. Order 13,498, § 2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26, 27, 44

**Rules**:
Fed. R. App. P. 32(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

App. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appellants' Appendix

Add. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appellants' Addendum

[ORAL ARGUMENT TO BE SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————————

No. 09-5236
————————————————
————————————————

DJAMEL AMEZIANE,
Petitioner-Appellee,

v.

BARACK OBAMA, et al.,
Respondents-Appellants.

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
————————————————

OPENING BRIEF FOR THE UNITED STATES, ET AL.
————————————————

**STATEMENT OF JURISDICTION**

Petitioner invoked the district court's jurisdiction under 28 U.S.C. § 2241. On

June 30, 2009 the district court entered the order that is the subject of this appeal,

which declined to seal the information at issue as "protected information" under the

governing protective order. Appellants' Appendix (App.) 86. On July 7, 2009, the

1

government filed a timely notice of appeal. App. 118. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 under the collateral order doctrine, or it has mandamus jurisdiction, an issue that is discussed more fully in Part I, below.

## STATEMENT OF THE ISSUE

The government submitted to the district court a declaration from Ambassador Daniel Fried, the State Department's Special Envoy for the Closure of the Guantanamo Bay Detention Facility, detailing the harm to diplomatic negotiations essential to closing Guantanamo that would be caused by publicly releasing the decision of the Guantanamo Task Force Review Panel to transfer a detainee while sensitive repatriation or resettlement negotiations are ongoing. The question presented is whether the district court erred in not crediting this assessment and instead ordering that the information be made publicly available in court records.

## STATEMENT OF THE CASE

Petitioner is a detainee at Guantanamo Bay, Cuba who has sought habeas corpus relief in the district court. A protective order entered in the case provides that the district court will seal information, called "protected information," when necessary "to protect the security of the United States and other significant interests." App. 8. While that case was pending, the Task Force Review Panel implementing the

2

Executive Order providing for the closure of Guantanamo determined that petitioner should be transferred out of United States custody. The government provided this information to the habeas court, and requested that it be sealed in court records as "protected information" because the State Department had concluded that its disclosure would harm diplomatic negotiations to repatriate and resettle detainees and thereby hurt the significant foreign policy and national security interests in closing Guantanamo. The district court (Judge Huvelle) declined, and ordered that the information be made available on the court's public docket. The government has now appealed that order.

## PROVISIONS AT ISSUE

The relevant provisions of the protective order that relate to protected information are reprinted in an addendum to this brief.

## STATEMENT OF FACTS

1. Petitioner Djamel Ameziane is a detainee at the United States Naval Base in Guantanamo Bay, Cuba. Petitioner is a citizen of Algeria. App. 49. In 2005, petitioner filed the instant habeas case. This habeas case and others are governed by a protective order entered in the district court by Judge Hogan, who was appointed to coordinate common procedural issues. *See* App. 7 (Protective Order and Procedures

for Counsel Access to Detainees at the United States Naval Base in Guantanamo Bay, No. 05-392, dkt. 70 (Sept. 11, 2008) ("Protective Order")).

In the protective order, the district court found that these cases "might . . . involve . . . protected information or documents, the storage, handling, and control of which might require special precautions in order to protect the security of the United States and other significant interests." App. 7-8. The order defines "protected information" to include "any document or information the Court deems, either *sua sponte* or upon designation . . . not suitable for public filing." App. 10. The order further provides that if the government "wish[es] to have the Court deem any document or information 'protected,'" it shall, after attempting to reach an agreement with petitioner's counsel, "fil[e] a motion with the Court." App. 14.

**2.** On January 22, 2009, the President issued an Executive Order directing that the Guantanamo Bay detention facility be closed and providing for review of the appropriate disposition of the detainees by a panel of review participants led by the Attorney General. Executive Order 13,492, 74 Fed. Reg. 4897 (Jan. 22, 2009). The review panel that administers the order is known as the Guantanamo Review Task Force Review Panel (herein, called the Review Panel). The Executive Order provides that the "Review shall determine, on a rolling basis and as promptly as possible with

respect to individuals currently detained at Guantanamo, whether it is possible to transfer or release the individuals consistent with the national security and foreign policy interests of the United States and, if so, whether and how the Secretary of Defense may effect their transfer or release." *Id*. § 4(c)(2). Further, the "Secretary of Defense, the Secretary of State, and, as appropriate, other Review participants shall work to effect promptly the release or transfer of all individuals for whom release or transfer is possible." *Id.*

The Executive Order also charged the Secretary of State to "expeditiously pursue and direct such negotiations and diplomatic efforts with foreign governments as are necessary and appropriate to implement this order." *Id*. § 5.

**3.** The Task Force Review Panel approved petitioner Ameziane for transfer from Guantanamo Bay on May 8, 2009. On May 21, 2009, the government notified petitioner's counsel and the court (Judge Huvelle) of this determination and, pursuant to the protective order, indicated that it would seek to have that information designated as protected. *See* App. 49. The government did not object to petitioner's counsel sharing this information with petitioner. Based on this information, the district court entered a Minute Order on May 27, 2009 in which it "issue[d] a stay in

the above-captioned case and order[ed] that the case shall be administratively closed pending further Order of the Court." App. 3.

On June 15, 2009, the government filed a coordinated motion in this and other cases involving a Review Panel transfer determination, formally requesting that transfer information be designated as protected and sealed by the Court under the protective order. *See* App. 4. The government's motion was supported by the declaration of Ambassador Daniel Fried, the State Department's Special Envoy for the Closure of the Guantanamo Bay Detention Facility. *See* App. 44 (Fried Decl.). Ambassador Fried explained to the Court that his "position was established in order to intensify diplomatic efforts to arrange for the repatriation or resettlement of individuals approved for such disposition under the review procedures established by Executive Order 13,492." *Id.*

Ambassador Fried stated that "indiscriminate public disclosure of the decisions resulting from reviews by Guantanamo Review Task Force will impair the U.S. Government's ability effectively to repatriate and resettle Guantanamo detainees" under Executive Order 13,492. *Id.* Ambassador Fried explained that due to concerns about inhumane treatment and torture, certain Guantanamo detainees cannot "responsibly [be] returned to their home countries." App. 45. The task of resettling

those detainees requires "every tool of statecraft at [the government's] disposal, including the ability to develop and implement a comprehensive strategy under which potential destination countries are asked to focus on those detainees whom the U.S. government considers to be the best fit for those countries." *Id.*

Ambassador Fried addressed the fact that "many of the detainees" seek "resettlement in certain European countries." App. 46. Because the "capacity [of Europe] to absorb detainees is limited, it is important to the U.S. goal of closing Guantanamo to be able to focus diplomatic discussions with those countries on detainees for whom there is a compelling reason not to return them to their home countries." *Id.* If, however, "petitioners' counsel or other organizations acting on behalf of dozens of detainees approach the same small group of governments . . . it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case." *Id.* He emphasized that "it is important for the U.S. government to retain the prerogative to 'speak with one voice' and to have the latitude to manage resettlement efforts without the problems potentially created by inconsistent signals from petitioners' counsel or other organizations." App. 47.

**4.** On June 30, 2009, the district court denied the government's motion. App. 86. The court stated that the government "has failed to explain with sufficient specificity why Ameziane's cleared status must be protected, or why his counsel should be prohibited from using the information to advocate for his resettlement to other countries." *Id.*

On July 7, 2009, the district court also denied the government's motion for a stay pending appeal. In conjunction with that denial, the district court issued a memorandum opinion and order. App. 120. The court reasoned that there is "no rational distinction between the public disclosure of court decisions ordering the release of the detainee and the public disclosure of transfer . . . notices." App. 124. The court stated that the government "provides no specificity as to why Ameziane's cleared status must be protected or why his counsel should not be prohibited from using the information to advocate for his resettlement to other countries." App. 125. The court also believed that petitioner "will be prejudiced by the nondisclosure" because petitioner is "engaged in resettlement discussion with two host countries" and "[b]oth countries have expressed an interest in whether petitioner has been cleared for transfer." *Id.* And, the court stated, protecting the information "will do little to prevent petitioner's counsel from soliciting other countries to accept him because, as

8

the government admits, petitioner's counsel is free to communicate directly with foreign governments to advocate for his resettlement." App. 126.

Finally, the court noted that the transfer decision had "already been made public" because petitioner's "counsel indicated[ that] both the Red Cross and petitioner's brother in Canada are already aware that petitioner has been cleared for transfer." *Id.*

**5.** The government is actively seeking to repatriate petitioner to his home country, Algeria.[1] The government previously attempted to repatriate petitioner to Algeria in October 2008 and provided advance notice of the proposed transfer in accordance with a district court order requiring such notice. *See* Order, dkt. 12 (D.D.C. April 12, 2005). In response to this notice, petitioner sought and obtained the injunction that now precludes his transfer to Algeria. *See* App. 35. The government has appealed this order and asked the court of appeals to vacate it in light of the Court's holding in *Kiyemba v. Obama*, 561 F.3d 509, 514 (D.C. Cir. 2009). *See Ameziane v. Obama*, No. 08-5511.

---

[1] The government began repatriating Algerian nationals detained at Guantanamo Bay in July 2008. Since July 2008, the government has transferred eight Guantanamo Bay detainees to Algeria consistent with the policies and practices outlined in the declarations of former Deputy Assistant Secretary of Defense for Detainee Affairs Sandra L. Hodgkinson and Ambassador Clint Williamson. *See* App. 129 & 134.

The government also moved the district court, on July 10, 2009, to dissolve that injunction based on this Court's holding in *Kiyemba*. *See* App. 5 (docket entry 234). That motion, which has been submitted to coordinating Judge Hogan for resolution, remains pending before the district court. In support of that motion, Ambassador Fried, in a separate declaration, explained that "the Department of State has assessed . . . that the six Algerian detainees [including petitioner] . . . can be repatriated to their country of nationality consistent with our policies on post-transfer humane treatment." App. 146.

If the injunction barring petitioner's transfer is dissolved, the government will proceed with meaningful discussions with the Government of Algeria to effectuate the repatriation of petitioner expeditiously. While the injunction is in place, the government is not able to engage in meaningful discussions with the Government of Algeria regarding the repatriation of petitioner. Any such discussions at this time would necessarily be contingent upon the outcome of future litigation. Such a contingency is problematic to the diplomatic process because the government must have the ability to make reliable representations and commitments when engaging directly with Algeria on matters of high sensitivity. Anything less could frustrate the

diplomatic relationship with Algeria and ultimately delay the transfer of the petitioner, as well as other detainees who are Algerian nationals. *See* App. 147-48.

## SUMMARY OF ARGUMENT

**I.** This Court has jurisdiction over this appeal under the collateral order doctrine. The appeal concerns a disclosure of information – the Guantanamo Task Force Review Panel decision to transfer a detainee – that would harm the government's significant national security and foreign policy interests by complicating the diplomacy needed to close Guantanamo and resettle or repatriate detainees, as appropriate. The order disclosing the information conclusively resolves the issue; it is separate from the merits and important; and disclosure of the information is irrevocable. Alternatively, this Court has supervisory mandamus authority to review the order, which is one of several conflicting decisions on the same issue in the district court.

**II.** The district court erred in declining to seal the information at issue.

**A.** First, the United States has significant national security and foreign policy interests that are at stake here. The President has stressed the importance of closing Guantanamo and repatriating or resettling detainees when appropriate. Ambassador Fried, in turn, explained in detail why the sensitive negotiations needed to resettle and

repatriate detainees are harmed by public disclosure of the Review Panel transfer decision. Namely, detainees are making their own independent efforts at negotiating resettlement that has created confusion and mixed messages. That confusion is heightened when someone other than a representative of the U.S. Government provides a foreign government with what purports to be official government information about the Review Panel's transfer decision.

This general concern is magnified in cases like this one – where the United States has determined that a detainee can be repatriated to his home country (here, to Algeria), but the detainee is conducting independent efforts at obtaining resettlement in a third country (here, in France and Canada). Because any country's ability to resettle detainees is limited – particularly European countries – the government must consider how best to match detainees with destination countries and, in doing so, focus resettlement efforts on those detainees unlike petitioner who cannot be sent home.

**B.** The district court erred in not crediting this assessment of harm to the diplomatic negotiations that are essential to closing Guantanamo and resettling or repatriating the detainees as appropriate. The government's assessment of the foreign policy harm is one where substantial deference to the Executive Branch is normally

provided, as courts have universally understood such assessments to be well outside their expertise.  Moreover, here, the harm identified is damage to the ability of the President to "speak for the nation with one voice in dealing with foreign governments," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000), a type of harm that has been recognized since the nation was founded.  The district court therefore erred in declining to give deference to Ambassador Fried's assessment that such harm would result from its decision.  By not deferring to this assessment, the district court committed legal error and abused its discretion.

**C.**  This is also not a case where there is a right of access to the information at issue derived from either the common law or the First Amendment.  Public access rights should be applied cautiously in cases like this one, which are unique in that they necessarily involve highly sensitive information.  Moreover, public access rights depend on whether the information at issue plays a significant role in the functioning of the process in question.  Here, however, the Review Panel transfer decision plays *no role* in the underlying merits of the habeas case – it is not relevant to the merits and is based on distinct factors.  Moreover, it is not being provided to the habeas court as part of litigating the merits, but instead for reasons entirely collateral to the proceeding, namely, so that the court may consider, in the first instance, whether a

13

temporary stay of the case is warranted to focus the court's limited resources on those habeas cases that must be resolved through litigation.

**D.** Finally, the public release of the information would provide no cognizable benefit to the petitioner. First, to the extent petitioner seeks to use the information in negotiating resettlement, nothing prevents those nations from approaching the United States directly to seek the information. Such direct State to State communications avoid the harm identified by Ambassador Fried that is created by the confusion and mixed messages that occur when the Review Panel decision is being provided through multiple unofficial diplomatic channels.

Second, the type of harm identified by petitioner associated with repatriation to his home country is harm this Court has explicitly rejected as warranting judicial intervention at least where, as in this case, and with respect to all Guantanamo detainees, "the record documents the policy of the United States not to transfer a detainee where he is likely to be tortured." *Kiyemba*, 561 F.3d at 514. Accordingly, the district court erred and abused its discretion in basing its decision to release the information on this type of alleged harm.

## STANDARD OF REVIEW

This Court reviews for an abuse of discretion a district court's order declining to seal court records. *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997). However, the resolution of legal issues involved in the exercise of that discretion are reviewed de novo. *Id.; see also United States v. Mejia*, 448 F.3d 436, 456 (D.C. Cir. 2006); *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 485 (4th Cir. 1992). Here, the issue of whether the foreign policy and national security interests described by the Government constitute "significant interests" under the protective order is a legal issue, and in evaluating that issue, substantial deference to the Executive Branch assessment is warranted. *See Chicago & S. Air Lines v. Waterman*, 333 U.S. 103, 111 (1948). *Cf. Fitzgibbon v. C.I.A.*, 911 F.2d 755, 766 (D.C. Cir. 1990).

## ARGUMENT

I. **THE DISTRICT COURT'S ORDER IS SUBJECT TO IMMEDIATE REVIEW AS A COLLATERAL ORDER, OR, IN THE ALTERNATIVE, THROUGH A WRIT OF MANDAMUS.**

**A.** This Court has jurisdiction over the appeal under 28 U.S.C. § 1291, because the district court's disclosure order is appealable under the collateral-order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949). That doctrine provides that a decision may be treated as final if it "'(1) conclusively determine[s]

the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment.'" *In re Sealed Case (Medical Records)*, 381 F.3d 1205, 1209 (D.C. Cir. 2004) (quoting *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)) (alterations in original).  In this case, all three of the *Cohen* requirements are satisfied.

The law of this Circuit provides "that orders compelling production of allegedly privileged information satisf[y] the three criteria for collateral review." *Sealed Case*, 381 F.3d at 1209 (D.C. Cir. 2004) .  While this case does not involve a litigation privilege, it involves considerations that are independently of substantial importance and concern the public interest, namely, substantial foreign policy and national security interests of the United States.  Further, those interests are implicated in litigation involving a comprehensive protective order due the acknowledged sensitivity of the information at issue. *In re Copley Press, Inc.*, 518 F.3d 1022, 1025 (9th Cir. 2008) (order unsealing judicial records appealable under collateral order doctrine); *see also Al Odah v. United States*, 559 F.3d 539, 543-44 (D.C. Cir. 2009) (appellate jurisdiction to consider disclosure of classified material to cleared counsel in Guantanamo case operating under similar protective order).  Accordingly, the order

here is immediately appealable under this Court's controlling circuit precedent given the significant foreign policy and national security interests that would be implicated by public disclosure.

**1.** First, the "the order 'conclusively and finally determined' that the documents were not protected from disclosure." *Sealed Case*, 381 F.3d at 1209. Specifically, the court's order will result in the information being placed on the public docket of the court. *Cf. Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979). Further, because the information is in the files of the district court, the government cannot obtain further review by withholding the information and going into contempt. *Cf. United States v. Nixon*, 418 U.S. 683, 691 (1974) (identifying exceptions to rule that "justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal").

**2.** The issue resolved by the district court's order is separate from the merits of the case and is important. The underlying merits issue presented by the habeas petitions is the lawfulness of detention. The issue in this appeal is the independent question whether the Review Panel transfer decision must be made publicly available

17

on the court's docket. *Cf. Sealed Case*, 381 F.3d at 1209 ("'the privilege question' here 'is separable from the merits of the underlying case'").

The issue also satisfies the importance requirement of *Cohen*. As an initial matter, the Protective Order provides that sealed treatment is appropriate when necessary to further a "significant interest[]" of the government. App. 8. Here, the President has concluded that the closure of Guantanamo and the "prompt and appropriate disposition" of the detainees "would further the national security and foreign policy interests of the United States." Exec. Order 13,498, § 2(b). Ambassador Fried, in turn, explained that "public disclosure of the decisions resulting from reviews by the Guantanamo Review Task Force will impair the U.S. Government's ability effectively to repatriate and resettle Guantanamo detainees." App. 44. Accordingly, and as will be explained in more detail below, the government has established a significant interest at issue that warrants immediate appeal. *Cf. Copley Press*, 518 F.3d at 1025 (order unsealing records satisfies second collateral order factor).

Another significant interest served by appeal is this Court's supervisory role over the district courts, which have issued conflicting rulings on the propriety of sealing Review Panel transfer decisions. Chief Judge Lamberth, Judge Leon, and

Judge Kessler have each determined, contrary to Judge Huvelle, that the Review Panel determinations should be sealed. *See* Addendum (Add.) 13 (*Mattan v. Obama*, No. 09-745, Mem. & Order (D.D.C. July 2, 2009) (under seal) (Lamberth, C.J.)); Add. 22 (*Al Ginco v. Obama*, No. 05-1310, Order (D.D.C. July 26, 2009) (under seal) (Leon, J.)); App. 127 (describing Judge Kessler's ruling). Further, Judge Walton, who previously resolved the issue *against* the government, has stayed further decision on the issue pending this Court's resolution of this appeal. Add. 20 (*Falesteny v. Obama*, No. 05-2386, Order, dkt. 1362 (D.D.C. July 23, 2009) (under seal) (Walton, J.)). Accordingly, the issue here is important to provide guidance to the district court.

In sum, the order here – which compels the public disclosure of sensitive information in a manner that would damage a significant foreign policy interest – is sufficiently important to warrant an immediate appeal, because it is "'weightier than the societal interests advanced by the ordinary operation of final judgment principles.'" *Sealed Case*, 381 F.3d at 1209 (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 879 (1994)). This Court needs to determine whether to protect a foreign policy and national security interest which the Executive Branch has concluded is a "significant interest."

**3.** The district court's order would be effectively unreviewable on appeal because the public disclosure of information directed by the order would moot any appeal. *See Copley Press*, 518 F.3d at 1025. This Court has stated that "[d]isclosure followed by appeal after final judgment is obviously not adequate" in cases involving privileges or sensitive information. *In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998); *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) ("Meaningful review entails having the reviewing court take a fresh look at the decision of the trial court before it becomes irrevocable. * * * Once the documents are surrendered pursuant to the lower court's order, confidentiality will be lost for all time. The status quo could never be restored").

Accordingly, because the district court decision is appealable under the collateral order doctrine, this Court has appellate jurisdiction over the government's appeal.

**B.** In the event that the Court should question the application of the collateral order doctrine to this appeal, the government, in the alternative, also seeks mandamus review of that order.

"The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." *Kerr v. United States District Court*, 426 U.S. 394, 402 (1976). In

determining whether mandamus is warranted, this Court considers "whether the party seeking the writ has any other adequate means, such as a direct appeal, to attain the desired relief," and "whether that party will be harmed in a way not correctable on appeal." *Nat'l Ass'n of Criminal Def. Lawyers, Inc. v. United States Dep't of Justice*, 182 F.3d 981, 986 (D.C. Cir. 1999). Moreover, the party seeking mandamus "has the 'burden of showing that its right to issuance of the writ is clear and indisputable.'" *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988).

In the context of a discovery dispute, mandamus is not generally granted. *See In re Executive Office of the President*, 215 F.3d 20, 23 (D.C. Cir. 2000) ("[i]n the normal course, * * * mandamus is not available to review a discovery order"). Mandamus relief can be granted, however, if there is "a viable claim that some important privilege will be infringed if discovery is allowed to proceed." *Id.* at 24. Accordingly, there are several recent instances where this Court has granted such relief in order to protect an important privilege. *See In re Papandreou*, 139 F.3d 247 (D.C. Cir. 1998) (granting mandamus relief of district court order that diplomats submit to depositions in order to review diplomats' assertion of immunity); *In re Sealed Case*, 151 F.3d 1059 (D.C. Cir. 1998) (granting mandamus where district court's discovery order was insufficiently protective of secret grand jury information).

21

In the present case, mandamus relief is likewise necessary and warranted to defend the important policy interests protected by the Protective Order that are discussed below. Absent a right to a collateral order appeal, mandamus is the only realistic avenue to vindicate the provisions protecting information when called for by a significant interest, here a significant foreign relations interest.

Further, "the Supreme Court . . . and this court . . . have expressed a willingness to employ the writ . . . in a supervisory capacity to remedy certain classes of error not traditionally thought remediable by mandamus." *United States v. Hubbard*, 650 F.2d 293, 309 n. 62 (1980); *see National Ass'n of Criminal Defense Lawyers*, 182 F.3d at 986. Here, even if this Court were to determine that appellate or mandamus jurisdiction was not otherwise appropriate, mandamus review by this Court in its supervisory capacity is warranted given the conflicting rulings of the district court on the same issue in conjunction with the decision by Judge Walton to stay his consideration of this issue pending guidance from this Court.

## II. THE DISTRICT COURT ERRED IN DECLINING TO SEAL THE REVIEW PANEL TRANSFER DECISION.

Ambassador Fried established that publicly releasing the Guantanamo Task Force Review Panel decision would cause damage to significant national security and foreign policy interests. Ambassador Fried's judgment is entitled to special deference given that he assessed the impact of disclosure on a core foreign relations function, negotiating with foreign nations regarding the resettlement and repatriation of detainees. The district court therefore erred – and abused its discretion – in concluding that the government "failed to explain . . . why his counsel should be prohibited from using the information to advocate for his resettlement to other countries." App. 86.

### A. The Government Has A Significant National Security and Foreign Policy Interest in Closing Guantanamo And Promptly Resettling or Repatriating Detainees.

The protective order entered in this case calls for the district court to seal information when needed to protect either the security of the United States or "other significant interests." App. 8. Moreover, in these unique habeas proceedings, involving military detention in wartime, a careful approach to public access is called for, as is reflected in comprehensive nature of the protective order, which

acknowledges that they will involve significant amounts of information that cannot be shared with the public. *See Boumediene*, 128 S. Ct. at 2276 (recognizing that in this context, certain "accommodations can be made" so long as they do not "impermissibly dilut[e] the protections of the writ").

Here, the government identified interests that are significant and warrant protection: the national security and foreign policy interests of the United States furthered by closing the Guantanamo detention facility and promptly repatriating or resettling those detainees for whom such a disposition is appropriate. As the President found, "prompt and appropriate disposition of the individuals currently detained at Guantanamo and closure of the facilities in which they are detained would further the national security and foreign policy interests of the United States and the interests of justice." Exec. Order 13,492, § 2.

To this end, the President charged the Secretary of State to "expeditiously pursue and direct such negotiations and diplomatic efforts with foreign governments as are necessary and appropriate to implement this order." Executive Order 13,492, § 5. Ambassador Fried, in turn, provided a detailed showing why the Review Panel information must be sealed to most effectively achieve the required diplomacy needed to repatriate and resettle detainees. As Chief Judge Lamberth concluded, the

24

diplomatic needs identified by Ambassador Fried, which are necessary to further the national security and foreign policy interests identified by the President in closing Guantanamo, are "sufficiently specific and . . . constitutes a 'significant interest' under the Protective Order." Add. 16 (footnote omitted).

**B.     Ambassador Fried Established That Releasing the Review Panel Decision Would Damage The Significant National Security and Foreign Policy Interests in Closing Guantanamo and Repatriating or Resettling Detainees.**

**1.**  As explained by Ambassador Fried, the government is working diligently to resettle or repatriate detainees who have been approved for transfer out of Guantanamo. *See* App. 45-46; *see also* Exec. Order 13,492, § 4. Executive Order 13,492 requires such transfers, *inter alia*, to facilitate the closure of the Guantanamo Bay detention facilities no later than January 22, 2010. *See* Exec. Order 13,492, § 3; *see also* App. 45.

Accordingly, "given the pace at which . . . review must proceed in order to meet the deadline set by the President," the U.S. government "will need every tool of statecraft at its disposal." App. 45. Any disruption of these sensitive negotiations will make that goal – which serves the shared interests of the detainees and the government in closure and appropriate disposition – only harder to achieve. *See* Exec. Order 13,498, § 2(b) ("[t]o the extent practicable, the prompt and appropriate disposition of

the individuals detained at Guantanamo should precede the closure of the detention facilities").

For this reason, Ambassador Fried explained that "indiscriminate public disclosure of the decisions resulting from reviews by the Guantanamo Review Task Force will impair the U.S. Government's ability effectively to repatriate and resettle Guantanamo detainees" under Executive Order 13,492. App. 44. Ambassador Fried noted the special challenges posed by detainees who, for one reason or another, cannot "responsibly [be] returned to their home countries." App. 45. The sensitive negotiations that could lead to resettlement of those detainees could be derailed if "large numbers of individuals (acting through, *inter alia* counsel or non-government organizations) approach the same group of governments at the same time seeking resettlement." App. 46.

If those groups have in hand the "formal U.S. government decisions resulting from review by the Guantanamo Review Task Force, it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case." App. 46. This is because the "provision of this additional information – *i.e.*, the fact that a particular Guantanamo detainee has been approved for repatriation or

resettlement . . . by someone other than a representative of the U.S. Government . . . has the potential to create confusion and mixed messages." App. 47. At the very least, having detainees present formal United States government information to such foreign governments would confuse the diplomatic process, and hinder the government's ability to speak with one voice regarding this critical foreign relations issue. *See id.*; *see also, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the nation with one voice in dealing with foreign governments").

In short, because any country's ability to resettle detainees is limited, the government must consider how best to match detainees with destination countries and, in doing so, must focus its efforts on those detainees who cannot be sent home. As Chief Judge Lamberth reasoned, the "Fried Declaration goes into . . . convincing detail – particularly with regard to the importance of prioritizing some detainees' resettlement above others, due to concerns regarding humane treatment in their home countries." Add. 15.

**2.** Petitioner's situation fits squarely within the concerns identified by Ambassador Fried. Petitioner is a detainee who the United States believes can be

repatriated to Algeria; but petitioner seeks public disclosure of the transfer decision in order to facilitate his private diplomatic efforts at obtaining resettlement in a third country.

For this reason, the district court erred in asserting that the government has provided "no specificity as to why Ameziane's cleared status must be protected or why his counsel should be prohibited from using the information to advocate for his resettlement to other countries." App. 125. Instead, Ambassador Fried's detailed rationale of harm applies squarely to this case.

Ambassador Fried explained that "many of the detainees" seek resettlement in "certain European countries" and that, because the "capacity [of Europe] to absorb detainees is limited, it is important to the U.S. goal of closing Guantanamo to be able to focus diplomatic discussions with those countries on detainees for whom there is a compelling reason not to return them to their home countries." App. 46. Ambassador Fried detailed why these types of independent efforts at resettlement – in conjunction with the implied imprimatur of the official government transfer determination – "could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case" given that the "capacity to absorb detainees is limited." *Id.*; *cf. Kiyemba*, 561 F.3d at 515 ("the requirement that

the Government provide pre-transfer notice interferes with the Executive's ability to

conduct the sensitive diplomatic negotiations required to arrange safe transfers for

detainees").

Petitioner fits precisely in this category – he is someone the government

believes can be repatriated to Algeria, and thus need not be resettled elsewhere.[2]

Moreover, petitioner is seeking resettlement in Europe (France), as well as in Canada.

*See* App. 64 ("we have had discussions with the French foreign Ministry about

resettlement"); App. 125 (identifying "two potential host countries"). Thus, the

district court incorrectly concluded that the government "failed to explain [the harm]

with sufficient specificity why . . . [petitioner's] counsel should be prohibited from

using the information to advocate for his resettlement." App. 86. Rather, Ambassador

---

[2] The United States stands ready to open discussions with the Government of Algeria for the repatriation of petitioner and release from United States custody. Further, the Department of State has conducted an individual assessment, on the basis of available information, and concluded that petitioner "can be repatriated to Algeria consistent with [the United States'] policies on post-transfer humane treatment." App. 147; *see* App. 140 (explaining government's policy of obtaining "assurances relating to humane treatment" and reviewing the adequacy of those assurances in light of "other information concerning the . . . political or legal developments in the foreign country that would provide context for the assurances provided"). As this Court recently recognized, "the Government does everything in its power to determine whether a particular country is likely to torture a particular detainee" and detainees "are not liable to be cast abroad . . . without regard to their treatment." *Kiyemba*, 561 F.3d at 514; *see also Munaf v. Geren*, 128 S.Ct. 2207, 2225 (2008).

Fried's declaration explains why the situation of a detainee who could be repatriated, but is instead seeking resettlement in Europe causes the most harm to the difficult effort to successfully resettle or repatriate Guantanamo detainees whom the United States wants to release before the year has passed.

Thus, Ambassador Fried's declaration therefore does not comprise simply "the same type of 'spare, generic assertion[s]' that both the D.C. Circuit and other judges of this Court have rejected in other Guantanamo cases." Add. 15 (citing, *inter alia*, *Parhat v. Gates*, 532 F.3d 834, 852 (D.C. Cir. 2008)). Instead, as Chief Judge Lamberth explained, Ambassador Fried explained in detail "that if the Task Force's determinations were to become immediately public, the multitude of individual petitioners' counsel approaching potential recipient governments would 'cause complications for and in some cases jeopardize [the government's] ability to implement a coherent diplomatic strategy.'" Add. 14-15 (quoting Fried Decl. ¶ 4).

Moreover, while the government cannot properly rest a motion to protect information on "generic claims applicable to all" cases (*Parhat*, 532 F.3d at 853), that is not to say that some types of information will not warrant protection as a categorical matter, so long as the government provides an adequate and detailed explanation to justify protection. *Cf. SafeCard Servs. v. SEC*, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

That is exactly what the government has done here. And because the nature of the government's concern is akin to the tragedy of the commons – *i.e.*, given the "tendency of many of the detainees . . . to express a preference for resettlement in certain European countries," App. 46 – the problems created by disclosure are inherently categorical and apply across the board, at least to detainees like petitioner who seek resettlement rather than repatriation. Thus, it is of no moment that, as the district court observed, the "government filed an identical motion in twenty-two different Guantanamo cases." App. 121. Accordingly, the type of harm identified – the "confusion and mixed messages" created when detainees approach resettlement countries with official U.S. government information – is of its nature categorical. *See* App. 47.

In sum, for the reasons set out by Ambassador Fried, the information at issue, if publicly released, would impair the government's "significant interest" in successful transfer of detainees, and therefore warrants protected status under the Protective Order. App. 8. As Chief Judge Lamberth explained, "diplomatic concerns associated with coordinated transfer of cleared detainees, including petitioner, constitutes a 'significant interest' under the Protective Order" and the information therefore is properly designated as "protected." Add. 16 (footnote omitted).

**C.** **The District Court Erred by Failing To Accord Substantial Deference to Ambassador Fried's Assessment That Release Would Harm Significant Interests.**

The overarching standard of review for a decision not to seal court records is an abuse of discretion. *El-Sayegh*, 131 F.3d at 160. However, by declining to defer to the government's assessment of harm to the significant foreign policy and national security interests in this case, the district court erred as a matter of law and abused its discretion. *Cf. Fitzgibbon*, 911 F.2d at 766. The serious diplomatic concerns laid out by Ambassador Fried are entitled to special deference given that they are assessments of the impact of disclosure on negotiating with foreign nations regarding the resettlement and repatriation of detainees. An analysis of the impact on that diplomacy is uniquely within the area of Ambassador Fried's expertise. The district court therefore erred – and abused its discretion – in concluding that the government "failed to explain . . . why his counsel should be prohibited from using the information to advocate for his resettlement to other countries." App. 86.

The resolution of legal issues involved in the exercise of discretion are reviewed de novo. *See Watson*, 974 F.2d at 485("if of error of law infecting the ultimate decision" regarding entry of protective order, court reviews "under the de novo review standard"). And it is legal error – and an abuse of discretion – to decline to provide

deference in circumstances where deference is warranted. *See Titanium Metals Corp. v. N.L.R.B.*, 392 F.3d 439, 449, 364 (D.C. Cir. 2004) (Board "does not have discretion to abandon its established deferral policies and act on whim" because "'[a]llowing the Board to disregard its own deference policy, which has been reinforced by long-standing and consistent case precedent, would undermine the careful development of the . . . standards of deference"); *see also Belize Telecom, Ltd. v. Government of Belize*, 528 F.3d 1298, 1308 (11th Cir. 2008) ("district court abused its discretion in failing to apply the [proper] analysis and refusing to defer" to a foreign court judgment).

The protective order expressly calls for the protection of information when necessary to "protect other significant interests" of the United States, and the assessment of those interests provided by the government must necessarily be given deference. *Cf. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 603 (1978) (court has "responsibility to exercise an informed discretion" in deciding whether to publicly release court records "with a sensitive appreciation of the circumstances that led to their production"). As this Court explained in a similar context, because "courts must accord substantial weight and deference to the affidavits" submitted by the United States explaining national security harm, "we decline to adopt the abuse-of-

discretion review . . . urge[d] upon us" and instead review a decision rejecting that harm *de novo*. *Fitzgibbon*, 911 F.2d at 766; *see Mejia*, 448 F.3d at 456 (while "in the ordinary case we would review a district court's issuance of a protective order only for abuse of discretion" need for classified information in proceeding is reviewed *de novo*); *United States v. Yunis*, 867 F.2d 617, 622 (D.C. Cir. 1989).

The need for deference is heightened when those interests touch on foreign policy and communications with foreign sovereigns, an area courts have universally understood to be outside their sphere of expertise. *See Chicago & S. Air Lines*, 333 U.S. at 111 (foreign policy "decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility"). The Constitution expressly assigns to the President the bulk of authority in the realm of foreign affairs. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-18 (1936) (discussing the origin of the powers of the federal government in respect of foreign affairs). In "this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation." *Id*. at 319; *see Haig v. Agee*, 453 U.S. at 293-94 ("foreign policy [is] the province and responsibility of the Executive").

Accordingly, the President "must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success." *Curtiss-Wright*, 299 U.S. at 319 (quoting 8 U.S. Sen. Reports Comm. on Foreign Relations at 24 (1816)). As the Court recognized, "foreign negotiations require caution" and "full disclosure . . . might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers." *Id.* at 320-21. Thus. in assessing issues involving the "interacting interests of the United States and of foreign countries, . . . [the courts] must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations.'" *Holmes v. Laird*, 459 F.2d 1211, 1215 (D.C. Cir. 1972) (quoting *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 383 (1959)); *see Joo v. Japan*, 413 F.3d 45, 52-53 (D.C. Cir. 2005) (adjudication that "would undo" Executive's judgment in foreign policy "would be imprudent to a degree beyond our power").

In sum, the serious diplomatic concerns laid out by Ambassador Fried are entitled to special deference, and the district court erred as a matter of law and abused its discretion in declining to defer to Ambassador Fried's assessment.

**C.    There Is No Common Law or Other Right of Public Access to the Review Panel Decision Information Contained in Court Records.**

The principles governing the right of public access to judicial records should inform the Court's interpretation of the protective order provisions governing the sealing of information:  because petitioner already has access to the information at stake, what he is in fact seeking is *public* access to that information.  Those principles militate against public release in these circumstances.

This Court has never held that there is a general right to access records in civil proceedings, but simply a reasonable right of access.  See *Flynt* v. *Rumsfeld*, 355 F.3d 697, 704 (D.C. Cir. 2004); *Center for National Security Standards v. U.S. Department of Justice,* 331 F.3d 918 (D.C. Cir. 2003).  Thus, this general lack of a right of access in civil cases militates against tipping the scales in favor of access once the government has identified a substantial interest that would be harmed by disclosure.

Even in cases addressing a First Amendment right of public access to the records of criminal proceedings, courts have looked first at whether the process to which access is sought "have historically been open to the press and general public," and second, whether "public access plays a significant positive role in the functioning of the particular process in question."  *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986); *see United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997); *In re Reporters Committee*, 773 F.2d 1325, 1332 (D.C. Cir. 1985).  As the Supreme

Court explained in *Press Enterprises*, although "many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of governmental operations that would be totally frustrated if conducted openly." 478 U.S. at 8-9. "[H]istory and experience shape[s]" application of this test. *Id*. at 9. And, of course, "to gauge accurately whether [the] role [of public access] is positive, the calculus must perforce take account of the flip side – the extent to which openness impairs the public good." *North Jersey Media Group v. Ashcroft*, 308 F.3d 198, 217 (3d Cir. 2002).

Applying these general public access principles to this case militates against providing access to the type of information at issue here, where public disclosure would harm significant national security and foreign policy interests. We do not dispute, as the district court reasoned, the general principle in the ordinary case "that 'public access plays a significant role in the functioning' of habeas proceedings." App. 123. But, as we have explained, these unique habeas proceedings call for a careful approach to public access, as is reflected in the protective order governing these cases. *See Boumediene*, 128 S. Ct. at 2276. And the specific information at issue – a Review Panel transfer decision – is not the sort of information where release

would "serve[] an important function of monitoring [government] . . . or judicial misconduct." *El-Sayegh*, 131 F.3d at 160.[3]

Public access to the transfer decision also does not and would not "play[] a significant positive role in the functioning of the particular process in question," here the habeas process. *Press-Enterprise*, 478 U.S. at 8. As this Court explained, and to the extent that common law access may be available, "what makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process." *El-Sayegh*, 131 F.3d at 163. Here, however, the Review Panel transfer decision is simply *not relevant* to the merits of the habeas proceeding. *See id.* at 161 (no right to access to document that "courts do not otherwise receive" to resolve the merits of the criminal case). The decision is not being used as evidence before the habeas court and is based on factors other than the legality of detention – namely, "whether it is possible to transfer or release the individuals consistent with the national security and foreign policy interests of the United States." Exec. Order 13,492, § 4(c)(2). Thus, because the Review Panel determination does not "play a significant . . . role in the . . . [habeas] process," *Press-Enterprise*, 478 U.S. at 8, the

---

[3] Moreover, the court has ample tools to monitor the government's efforts at transfer once a decision has been made, such as by requiring status reports. Further, the decision to seal these records can be reconsidered once petitioner's transfer is effectuated.

district court erred in reasoning there is "no rational distinction between the public disclosure of court decisions ordering the release of the detainee and the public disclosure of transfer clearance notices." App. 124.[4]

Indeed, the decision is provided to the Court for reasons entirely collateral to the merits of the proceeding, namely, to allow the court to consider temporarily staying those cases to conserve very limited resources that are being spread amongst a great number of active habeas cases (not to mention the court's remaining docket). It is in the interest of justice to provide transfer information to the habeas court – without necessitating the damage that would be caused by public disclosure – so that the court may consider, in the first instance, whether a temporary stay is warranted to focus the court's limited resources on those habeas cases that must be resolved through litigation, in conjunction with periodic status reports on the government's efforts at resettlement or repatriation.

In sum, not only is the larger public interest in prompt resolution of Guantanamo cases served by allowing the government to provide this information to the habeas court under seal, public release of the transfer decision would contribute

---

[4] Judge Leon has sealed the Review Panel transfer decision in a case where he has also granted petitioner's habeas writ. *See Al Ginco v. Obama*, No. 05-1310, Order (D.D.C. July 26, 2009) (under seal) (Leon, J.)

nothing to the public's evaluation of the merits of the habeas process. *Cf. United States v. Gonzales*, 150 F.3d 1246, 1261 (10th Cir. 1998) (even in criminal case, there is no right to access materials that do not "relate to the core proceeding – the determination of guilt or innocence of the defendant").

**D.     Public Release Of The Information Would Provide No Public Benefit Or Benefit to Petitioner.**

Petitioner has urged that he would benefit from public release of the transfer decision, because he can use the information to negotiate his resettlement to a third country. This interest, however, is both unsubstantiated and is not the sort of interest that warrants public release given the larger public good served by protecting the information.

**1.** First, there is no actual harm caused to petitioner by protecting the Review Panel decision. The district court reasoned that petitioner "will be prejudiced by the nondisclosure" because "two potential host countries . . . . have expressed an interest in whether petitioner has been cleared for transfer." App. 125. Petitioner, similarly, has urged that he is harmed because he is "prohibit[ed] . . . from using this information to facilitate his resettlement in a country other than Algeria." Opp. to Emerg. Mot. for Stay at 15 (filed July 9, 2009). But this claimed harm is not in reality actual harm. A third country could not agree to resettlement without substantial diplomatic

negotiations that include the State Department. If a third country is serious about resettlement and to that end would like to know petitioner's Task Force status, nothing prevents that country from communicating directly with the United States government. That avenue of communication eliminates the "confusion and mixed messages" identified by Ambassador Fried as the precise harm created by the indiscriminate release of the official information. App. 47. Moreover, it is consistent with the important foreign policy interests identified above, that the United States speak with one voice in its negotiations with foreign powers. *Curtiss-Wright*, 299 U.S. at 319 ("the President alone has the power to speak or listen as a representative of the nation").

Second, in the circumstances of this case, the type of harm petitioner identifies – a desire to avoid being transferred to Algeria – is not the type of harm cognizable in this habeas proceeding. The basic purpose of petitioner's habeas proceeding is to obtain a release from custody, and the government is prepared to release him now by repatriating him to his home country, Algeria. The government tried to effectuate such a repatriation in October 2008, but was enjoined from doing so pending this Court's resolution of *Kiyemba*. Although *Kiyemba* has been resolved, and a petition for rehearing *en banc* denied, that injunction remains pending.

As this Court recognized, however, the Supreme Court decision in "*Munaf* precludes a court from issuing a writ of habeas corpus to prevent a transfer" on grounds like those claimed by petitioner. *Kiyemba*, 561 F.3d at 514. This is because here, as in *Kiyemba*, the "record documents the policy of the United States not to transfer a detainee to a country where he is likely to be tortured" and "the Government does everything in its power to determine whether a particular country is likely to torture a particular detainee"; detainees "are [therefore] not liable to be cast abroad . . . without regard to their treatment." *Kiyemba*, 561 F.3d at 514. Thus, "the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Id.* It also may not "enjoin . . . transfer based upon the expectation that a recipient country will . . . prosecute them." *Id*. at 515. This Court in *Kiyemba* declined to engage the courts in the foreign policy determinations required to transfer a detainee, and petitioner therefore should not be able to base his claim to publicly disclose the Review Panel decision on his own effort at foreign policy assessment and negotiation.

**2.** Moreover, the public interest does not call for the release of Review Panel determinations while resettlement or repatriation negotiations are ongoing. As we have explained, the public interest that is served by the common law right of access

to court records is not implicated here because the Task Force information plays no role in the merits of these habeas proceedings. *See El-Sayegh*, 131 F.3d at 163.

Further, as Ambassador Fried explained, the use of the formal Review Panel decision could "confuse, undermine, or jeopardize our diplomatic efforts . . . and could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case." App. 46. Thus, maintaining the information under seal, with control of that information at the hands of the Executive Branch in pursuit of the diplomatic effort to resettle and repatriate detainees, serves a *global* approach to repatriating and resettling all the detainees at Guantanamo Bay who have been approved for transfer, over promoting solely the interests of petitioner at the expense of others. That approach is most consistent with the public interest expressed in the President's executive order to secure the "prompt and appropriate disposition of the individuals" detained and "closure of" Guantanamo, goals that "further the national security and foreign policy interests of the United States." Exec. Order, § 2(b). Accordingly, the public interest calls for sealing, not disclosing, the Review Panel transfer information.

**E. The District Court's Other Rationales For Releasing the Information Are Without Merit.**

The district court cited certain other rationales for declining to seal the records, none of which have merit. First, the district court stated that the government's position is "riddled with contradictions" because it "permitted the fact that a petitioner has been cleared for transfer to be public" in one case, *Batarfi v. Gates*, No. 05-409, and "chose not to appeal" the decision of Judge Walton in *Naji v. Obama* and *Yoyej v. Obama*, No. 05-2386 to disclose transfer information with respect to two petitioners. App. 124; *see* Add. 5, 7 (*Batarfi*), 9 (*Naji*); 11 (*Yoyej*). This analysis does not, of course, provide a reasoned basis for declining to seal the material, particularly given the district court's explanation that each case should be viewed on the particular facts presented. App. 125.

Further, the decision to transfer Batarfi was one of the first made by the Review Panel, and it was cases like that one that alerted the government to the diplomatic problems caused by public disclosure of such information. Additionally, the government sought to seal the records in the two cases before Judge Walton, but did not yet have the benefit of the Fried Declaration to support that motion, and Judge Walton gave the government no time to consider appellate options by immediately "order[ing] that the Clerk shall make the respondents' motion . . . available to the public." Add. 9; *see* Add. 11. Since receiving the government's submission of the

Fried Declaration, Judge Walton has *not* ordered transfer information publicly disclosed, and has recently "ordered that the transfer decisions . . . shall remain under seal pending the resolution" of this appeal. Add. 20 (*Falesteny v. Obama*, No. 05-2386). Accordingly, the development of the government's experience with this issue in the different district courts does not provide a reasoned basis for rejecting the government's request to seal the information at issue.

Second, the district court stated that sealing the information would "serve little purpose because that information has already been made public." App. 126. The court further explained that "counsel indicated [that] the Red Cross and petitioner's brother . . . are already aware that petitioner has been cleared for transfer." *Id*. This statement by the district court was expressly based on an "indicat[ion]" of counsel, and was not confirmed by the government and unsupported by any evidence submitted to the lower court. Even if true, however, there is a substantial difference between a disclosure of information made by a private entity or an individual and a formal acknowledgment by the U.S. Government. *See Fitzgibbon v. C.I.A.* 911 F.2d 755, 765 (D.C. Cir. 1990) (because of the "critical difference between official and unofficial disclosures," information may be released under FOIA only if the "specific" information "has been officially acknowledged"). Unauthorized disclosures by

petitioner's brother or the Red Cross simply do not constitute the sort of "preserv[ation] in a permanent public record" (App. 126 (quoting *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)), or "official[] acknowledg[ment]" (*Fitzgibbon*, 911 F.2d at 765), even if FOIA standards were appropriate here.

Indeed, the types of communications identified by the district court are those that create the harm identified by Ambassador Fried:  he expressly explained that when speakers other than the government "relay information about formal U.S. government decisions resulting from review by the Guantanamo Review Task Force, it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case."  Fried Decl. ¶ 5; *id*. ¶ 6 ("[i]t is the provision of this additional information, *i.e.*, the fact that a particular . . . detainee has been approved . . . as a result of review by the . . . Task Force – by someone other than a representative of the U.S. Government that has the potential to create confusion and mixed messages").[5]

---

[5]  To the extent the Red Cross may have access to official information of this nature, their access is provided pursuant to their oversight role and is provided in accordance with a confidentiality agreement.  *See* Testimony of Jay Alan Liotta, Principal Director, Office of Detainee Policy, U.S. Department of Defense, Subcomm. of International Organizations, Human Rights and Oversight, House Committee on

-----------------------------

In sum, the district court erred and abused its discretion when it did not credit the significant foreign policy and national security interests that would be harmed by publicly disclosing the Review Panel transfer decision.

---

Foreign Affairs (July 17, 2009), *available at* http://foreignaffairs.house.gov/111/lio071609.pdf.

## CONCLUSION

For the foregoing reasons, the district court's order should be reversed.

Respectfully submitted,

TONY WEST
 *Assistant Attorney General*

DOUGLAS N. LETTER
  (202) 514-3602
ROBERT M. LOEB
  (202) 514-4332
AUGUST E. FLENTJE
  (202) 514-1278
*Attorneys, Appellate Staff*
*Civil Division, Room 7242*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530-0001*

August 6, 2009

**PROTECTED INFORMATION – FILED UNDER SEAL**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
OF THE FEDERAL RULES OF APPELLATE PROCEDURE**

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule

32(a), that the foregoing brief is proportionally spaced, has a typeface of 14 point and

contains 9992 words (which does not exceed the applicable 14,000 word limit).


_____

August E. Flentje

**PROTECTED INFORMATION – FILED UNDER SEAL**

**CERTIFICATE OF SERVICE**

I hereby certify that on this August 6, 2009, I caused copies of the foregoing

brief to be served upon counsel of record by causing copies to be sent by first-class

mail and by e-mail transmission to lead counsel for each case:


_____
August E. Flentje

**ADDENDUM**

## TABLE OF CONTENTS

**Page**

Selected Protective Order Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Batarfi v. Gates*, No. 05-0409 (D.D.C.) (EGS)
    Joint Motion for Stay, filed March 30, 2009 (docket entry 178) . . . . . . . . . 5
    Order Staying Proceedings, filed April 3, 2009 (docket entry 182) . . . . . . . 7

*Yoyej v. Obama* & *Naji v. Obama*, No. 05-2386 (D.D.C.) (RBW)
    Order, entered June 3, 2009 (docket entry 1268) . . . . . . . . . . . . . . . . . . . . . 9
    Order, entered June 4, 2009 (docket entry 1271) . . . . . . . . . . . . . . . . . . . . 11

*Mattan v. Obama*, No. 09-745 (D.C.C.) (RCL)
    Mem. & Order, entered July 2, 2009 (under seal) . . . . . . . . . . . . . . . . . . . . 13

*Falesteny v. Obama*, No. 05-2386 (D.D.C.) (RBW)
    Order, entered July 23, 2009 (under seal) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Al Ginco v. Obama*, No. 05-1310 (D.D.C.) (RJL)
    Order, entered July 26, 2009 (under seal) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Taher v. Obama*, No. 06-1684 (D.D.C.) (GKK)
    Unopposed Motion for Stay, filed Aug. 4, 2009 (under seal) . . . . . . . . . . . 23

The Protective Order (App. ___) provides that in this and other habeas cases

filed by detainees held at Guantanamo Bay,

> the Court finds that the above-captioned cases involve national
> security information or documents, the storage, handling, and control
> of which require special security precautions and access to which
> requires a security clearance and a "need to know."  These cases
> might also involve other protected information or documents, the
> storage, handling, and control of which might require special
> precautions in order to protect the security of the United States and
> other significant interests.

JA ___ (Protective Order at 1-2).

That protective order defines protected information as follows:

> The terms "protected information and/or documents," "protected
> information," and "protected documents" mean any document or
> information the Court deems, either sua sponte or upon designation
> pursuant to paragraph 34 of this Protective Order, not suitable for
> public filing.

JA ___ (Protective Order ¶ 10).

The order provides the following procedures governing the designation and

handling of protected information:

> E. Designation Procedures for and Access to Protected Information
> and Documents

> 34.    Should government counsel in these consolidated cases wish to
> have the Court deem any document or information "protected,"
> government counsel shall disclose the information to qualified
> counsel for petitioners—i.e., counsel who have satisfied the
> necessary prerequisites of this Protective Order for the viewing

of protected information—and attempt to reach an agreement about the designation of the information prior to filing a motion with the Court. Petitioners' counsel shall treat such disclosed information as protected unless and until the Court rules that the information should not be designated as protected.

35.     Without authorization from the government or the Court, protected information shall not be disclosed or distributed to any person or entity other than the following:

        a. petitioners' counsel, provided such individuals signed the Acknowledgment, attached hereto as Exhibit B, attesting to the fact that they read this Protective Order and agree to be bound by its terms; and
        b. the Court and its support personnel.

36.     The execution of the Acknowledgment is a condition precedent to a petitioner's counsel having access to, or continued access to, protected information for the purposes of these proceedings. A copy of each executed Acknowledgment shall be kept by counsel making the disclosure until thirty days after the termination of this action, including appeals.

37.     The substitution, departure, or removal of petitioners' counsel from these cases for any reason shall not release that person from the provisions of this Protective Order or the Acknowledgment executed in connection with this Protective Order.

38.     Petitioners' counsel shall not disclose the contents of any protected documents or information to any person, including counsel in related cases brought by Guantanamo Bay detainees in this or other courts, except as authorized by this Protective Order, the Court, or government counsel. Except as otherwise specifically provided by Judge Colleen Kollar-Kotelly with respect to counsel for petitioners Mohammed Ahmed al Kandari, Fawzi Khalid Abdullah Fahad al Odah, and Khalid

Abdullah Mishal al Mutairi in Al Odah v. United States, 02-cv-0828, petitioners' counsel in these coordinated cases may share protected information with each other but only to the extent that counsel have appropriate security clearances and comply with all other procedures set forth in this Protective Order. Petitioners' counsel shall maintain all protected information and documents received through this proceeding in a confidential manner.

39.   Petitioners' counsel shall not disclose protected information not provided by a petitioner-detainee to that petitioner-detainee without prior concurrence of government counsel or express permission of the Court.

40.   Except as otherwise provided herein, no petitioner or petitioner's counsel shall disclose or cause to be disclosed any information known or believed to be protected in connection with any hearing or proceeding in these cases.

41.   At no time, including any period subsequent to the conclusion of these proceedings, will petitioners' counsel make any public or private statements disclosing any protected information or documents accessed pursuant to this Protective Order, including the fact that any such information or documents are protected.

42.   Protected information shall be used only for purposes directly related to these cases and not for any other litigation or proceeding, except by leave of the Court. Photocopies of documents containing such information shall be made only to the extent necessary to facilitate the permitted use hereunder.

43.   Nothing in this Protective Order shall prevent the government from using for any purpose protected information it provides a party. Nothing in this Protective Order shall entitle another party to protected information.

44.     Supplying protected information to another party does not waive privilege with respect to any person or use outside that permitted by this Protective Order.

45.     Within sixty days of the resolution of these actions, and the termination of any appeals therefrom, all protected documents or information, and any copies thereof, shall be promptly destroyed, provided that the party to whom protected information is disclosed certifies in writing that all designated documents and materials have been destroyed, and further provided that government counsel may retain one complete set of any such materials that were presented in any form to the Court. Any such retained materials shall be placed in an envelope or envelopes marked "Protected Information Subject to Protective Order." In any subsequent or collateral proceeding, a party may seek discovery of such materials from the government, without prejudice to the government's right to oppose such discovery or its ability to dispose of the materials pursuant to its general document retention policies.